**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN DOE, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:20-cv-02531 SJC |
| DONALD J. TRUMP, in his individual and official capacity as President of the United States; MITCH MCCONNELL, in his individual and official capacity as a Senator and Sponsor of S. 3548 CARES Act; and STEVEN MNUCHIN, in his individual and official capacity as the Acting Secretary of the U.S. Department of Treasury, CHARLES RETTIG, in his individual and official capacity as U.S. Commissioner of Internal Revenue; U.S. DEPARTMENT OF TREASURY; the U.S. INTERNAL REVENUE SERVICE; and the UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Honorable Sharon Johnson Coleman |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CLAIMS AGAINST THE UNITED STATES**

Plaintiff, JOHN DOE ("Doe" or "Plaintiff"), on behalf of himself and others similarly situated (the "Putative Class"), and submits this Memorandum in Opposition to Defendants' Motion to Dismiss Claims Against the United States.

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iii

PROCEDURAL HISTORY ...................................................................................................... 1

INTRODUCTION ..................................................................................................................... 1

ARGUMENT .............................................................................................................................. 5

  I.    Sovereign Immunity is Waived by the APA Regardless of Whether a Claim "Arises Under" the APA ......................................................................................................... 5

  II.   Plaintiffs' Claims are not Barred by the Anti-Injunction Act or the Declaratory Injunction Act .................................................................................................................. 9

     A.   *Refundable Tax Credits are Not Taxes, and Do Not Implicate the AIA or the DJA.* ... 9

     B.   *CARES Act Amendments to the Internal Revenue Code Expressly Providing that the CARES Act Payments are Subject to Deficiency Procedures Remove Any Doubt that the Credit is Not a Tax.* ........................................................................................................ 12

  III.  *In the Alternative*, Plaintiffs' Case Does "Arise Under" the APA ................................. 13

     A.   *The Agency Action at Issue is Final.* .............................................................. 14

     B.   *No Adequate Alternatives for Challenging the Agency Action Exist.* ........................ 15

  IV.  Plaintiffs Have Standing and their Claims are Ripe for Judicial Review Now ............. 16

  V.   The FCA States a Claim for Relief ................................................................................. 19

     A.   *Section 6428(g) violates the First Amendment of the U.S. Constitution.* .................. 20

       1.  Freedom of Association ............................................................................ 20

       2.  Freedom of Expression ............................................................................. 21

     B.   *Section 6428(g) violates the Fifth Amendment of the U.S. Constitution.* .................. 27

       1.  Marriage ...................................................................................................... 27

       2.  Alienage ...................................................................................................... 31

  VI.  Even if the CARES Act's Infringement on Plaintiffs' Rights under the Fifth Amendment Warranted Rational Basis Review, there is no Rational Basis for the Exclusion Provision ..................................................................................................... 33

     A.   *Administrative Concerns Do Not Constitute a Valid Rational Basis for Excluding Plaintiffs from Receipt of the Advance Payment or the CARES Act Credit.* .............. 33

     B.   *The Exclusionary Provision is Merely a Vehicle to Punish an Unpopular Group.* ... 36

CONCLUSION ........................................................................................................................ 39

## TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Peña,*
  515 U.S. 200 (1995) .................................................................................. 38

*Alliance for Open Society International, Inc. v. United States Agency for International
  Development,* 651 F.3d 218 (2d Cir. 2011) ............................................. 29

*Amador v. Mnuchin,*
  2020 WL 4547950 (D. Md. Aug. 5, 2020) ............................. 8, 19, 24, 37

*Ashcroft v. American Civil Liberties Union,*
  542 U.S. 656 (2004) .................................................................................. 30

*Baskin v. Bogan,*
  12 F. Supp. 3d 1144 (S.D. Ind.), *aff'd,* 766 F.3d 648 (7th Cir. 2014) .................. 32

*Bernal v. Fainter,*
  467 U.S. 216 (1984) .................................................................................. 39

*Bob Jones Univ. v. Simon,*
  416 U.S. 725 (1974) .................................................................................. 11

*Boddie v. Connecticut,*
  401 U.S. 371 (1971) ................................................................... 24, 33, 38

*Bolling v. Sharpe,*
  347 U.S. 497 (1954) ............................................................................ 33, 37

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) .................................................................................... 7

*Braunfield v. Brown,*
  366 U.S. 599 (1961) .................................................................................. 31

*Brown v. Board of Education of Topeka,*
  347 U.S. 483 (1954) .................................................................................. 37

*Carey v. Piphus,*
  435 U.S. 247 (1978) .................................................................................. 33

*Castro v. Dart,*
  2020 WL 5209805 (N.D. Ill. Sept. 1, 2020) ........................................... 23

*Church of Scientology of Celebrity Ctr., Los Angeles v. Egger,*
  539 F. Supp. 491 (D.D.C. 1982) ............................................................. 14

*CIC Services, LLC v. Internal Revenue Service,*
  Docket No. 19-930 (Sup. Ct. 2020) ........................................................ 14

*Cleveland Bd. of Ed. v. LaFleur,*
  414 U.S. 632 (1974) .................................................................................. 32

*Cohen v. United States,*
  650 F.3d 717 (D.C. Cir. 2011) ................................................................. 11

*Delano Farms Co. v. California Table Grape Com'n,*
  655 F.3d 1337 (Fed. Cir. 2011) ................................................................. 9

*Den ex dem. Murray v. Hoboken Land & Imp. Co.,*
  59 U.S. 272 (1855) .................................................................................... 35

*Department of Agriculture v. Moreno*
  413 U.S. 528 (1973) ....................................................................... 43, 44, 46

*Department of Homeland Security et al. v. Regents of the University
  of California Wolf v. Vidal,* No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020) ............... 5, 6

*Druker v. Comm'r*,
  697 F.2d 46 (2d Cir. 1982)............................................................................... 34
*Eisenstadt v. Baird*,
  405 U.S. 438 (1972)........................................................................ 44, 45, 46
*Fla. Bankers Ass'n v. U.S. Dep't of the Treasury*,
  799 F.3d 1065 (D.C. Cir. 2015)............................................................. 11, 12
*Franklet v. United States*,
  578 F.Supp. 1552 (N.D. Cal. 1984) ................................................................ 26
*Freedom from Religion Foundation v. Shulman*,
  961 F.Supp.2d 947 (W.D. Wis. 2013) ................................................... *passim*
*Graham v. Richardson*,
  403 U.S. 365 (1971).................................................................................. 38, 39
*Griffin v. Illinois*,
  351 U.S. 12 (1956)........................................................................................... 38
*Griswold v. Connecticut*,
  381 U.S. 479, 485 (1965)......................................................................... 24, 32
*Heckler v. Matthews*,
  465 U.S. 728 (1984)......................................................................................... 21
*Jane Doe v. Donald J. Trump*,
  No. 820CV00858SVWJEM, 2020 WL 5492994, (C.D. Cal. Sept. 2, 2020)..................... 31, 40
*Joint Anti-Fascist Refugee Committee v. McGrath*,
  341 U.S. 123 (1951)......................................................................................... 33
*Khan v. United States*,
  753 F.2d 1208 (3d Cir. 1985)......................................................................... 26
*Koala v. Khosla*,
  931 F.3d 887 (9th Cir. 2019) ......................................................................... 29
*M. L. B. v. S. L. J.*,
  519 U.S. 102 (1996)......................................................................................... 32
*Mass. Bd. of Retirement v. Murgia*,
  427 U.S. 307 (1976)......................................................................................... 36
*Mathews v. Diaz*,
  426 U.S. 67 (1976)........................................................................................... 40
*Matter of Laureano*,
  19 I. & N. Dec. 1, 1, 1983 BIA LEXIS 18 (B.I.A. December 12, 1983)................................ 43
*Maynard v. Hill*,
  125 U.S. 190 (1888)......................................................................................... 36
*Meyer v. Nebraska*,
  262 U.S. 390 (1923)......................................................................................... 32
*Michigan v. United States Army Corps of Engineers*,
  667 F.3d 765 (7th Cir. 2011) ........................................................................... 9
*National Federation of Independent Business v. Sebelius*,
  567 U.S. 519 (2012)................................................................................... 11, 12
*Nelson v. Regan*,
  731 F.2d 105 (2d Cir. 1984)...................................................................... 12, 13
*Nyquist v. Mauclet*,
  432 U.S. 1 (1977)............................................................................................. 39

*Patterson v. Commissioner*,
  No. 8798-86, 1989 Tax Ct. Memo LEXIS 193 (T.C. Apr. 27, 1989) ...................................... 31
*Perry v. Sinderman*,
  408 U.S. 593 (1972) ........................................................................................................ 28
*Roberts v. United States Jaycees*,
  468 U.S. 609 (1984) ........................................................................................................ 24
*San Antonio Indep. Sch. Dist. v. Rodriguez*,
  411 U.S. 1 (1973) ............................................................................................................ 23
*Schinasi v. Comm'r*,
  53 T.C. 382 (1969) .......................................................................................................... 45
*Schlesinger v. Ballard*,
  419 U.S. 498 (1975) ........................................................................................................ 33
*Schneider v. Rusk*,
  377 U.S. 163 (1964) ........................................................................................................ 33
*Skinner v. Oklahoma ex rel. Williamson*,
  316 U.S. 535 (1942) .................................................................................................. 32, 38
*Sorenson v. Sec'y of Treasury of U.S.*,
  475 U.S. 851 (1986) .................................................................................................. 12, 13
*Sorenson v. Sec'y of Treasury of U.S.*,
  752 F.2d 1433 (9th Cir. 1985) ........................................................................................ 13
*Speiser v. Randall*,
  357 U.S. 513 (1958) ............................................................................................ 27, 28, 29
*Sta-Rite Indus., Inc. v. Allstate Ins. Co.*,
  96 F.3d 281 (7th Cir. 1996) ............................................................................................ 37
*Sugarman v. Dougall*,
  413 U.S. 634 (1973) .................................................................................................. 32, 39
*Takahashi v. Fish & Game Com.*,
  334 U.S. 410 (1948) ........................................................................................................ 38
*The Presbyterian Church (U.S.A.) v. United States*,
  870 F.2d 518 (9th Cir. 1989) .......................................................................................... 7
*Thunder Basin Coal Company v. Reich*,
  510 U.S. 200 (1994) .................................................................................................. 21, 22
*Trudeau v. Federal Trade Com'n*,
  456 F.3d 178 (D.C. Cir. 2006) ...................................................................................... 8, 9
*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*,
  136 S. Ct. 1807 (2016) ........................................................................................ 16, 17, 18
*United States v. Windsor*,
  570 U.S. 744 (2013) .................................................................................................. 34, 35
*W. Va. State Bd. Of Educ. v. Barnette*,
  319 U.S. 624 (1943) .................................................................................................. 28, 29
*Wooley v. Maynard*,
  430 U.S. 705 (1977) .................................................................................................. 28, 29
*Zablocki v. Redhail*,
  434 U.S. 374 (1978) ........................................................................................................ 37

**Statutes**
18 U.S.C. § 287 .................................................................................................................. 15

28 U.S.C. § 1331 ...................................................................................................... 5
28 U.S.C. § 1367 ...................................................................................................... 5
5 U.S.C. § 702 .......................................................................................................... 6
I.R.C. § 1 ........................................................................................................... 22, 26
I.R.C. § 6012 ............................................................................................. 22, 23, 25
I.R.C. § 6013 ......................................................................................................... 22
I.R.C. § 6211 ......................................................................................................... 12
I.R.C. § 6212 ................................................................................................... 12, 15
I.R.C. § 6428 ................................................................................................... *passim*
I.R.C. § 6662 ......................................................................................................... 15
I.R.C. § 6671 ......................................................................................................... 13
I.R.C. § 6702 ......................................................................................................... 22
I.R.C. § 6751 ......................................................................................................... 34
I.R.C. § 6752 ......................................................................................................... 34
I.R.C. § 7201 ......................................................................................................... 15
I.R.C. § 7203 ......................................................................................................... 22
I.R.C. § 7421 ..................................................................................................... 9, 10
I.R.C. § 7422 ......................................................................................................... 13
I.R.C. § 7703 ......................................................................................................... 22

**Other Authorities**
BLACK'S LAW DICTIONARY (10th ed. 2014) ................................................... 31
CARES Act, Pub. L. No. 116-136, March 27, 2020, 134 Stat 281 ...................... 2, 3

**Constitutional Provisions**
U.S. Const. amend. I .............................................................................................. 21
U.S. Const. amend. V ....................................................................................... 27, 28
U.S. Const. amend. XIV ........................................................................................ 31

**PROCEDURAL HISTORY**

On April 24, 2020, Plaintiff John Doe, individually and on behalf of others similarly situated, filed a class action complaint challenging the Coronavirus Aid, Economic Relief, and Security Act (the "CARES Act" or "Act") and alleging violations of his constitutional rights. Dkt. 1. Plaintiff subsequently filed his First Amended Complaint ("FAC") and his Emergency Motion seeking emergency declaratory and injunctive relief. ("Em. Mot."). Dkts. 11 & 13. Plaintiff filed his Second Amended Complaint ("SAC") on May 2, 2020. Dkt. 20. Defendants objected to the granting of Plaintiff's Emergency Motion (Dkt. 22), and Plaintiff filed his Reply in Support of his Motion on May 29, 2020 ("TRO Reply"). Dkt. 25. On July 7, 2020 Defendants filed a Motion to Dismiss All Defendants other than the US and a Memorandum in Support of that motion. Dkts. 44 & 45. Plaintiff filed an Opposition to that motion on August 4, 2020. Dkt. 52. Defendants filed a Reply Brief in Support of the Motion to Dismiss All Defendants other than the US on August 11, 2020. Dkt. 55. The Em. Mot. and Motion to Dismiss All Defendants other than the US have been fully briefed and the Court has taken them under advisement. Dkts. 40 & 56.

Defendants filed a Motion to Dismiss Claims Against the United States on August 4, 2020. Dkt. 50. The Court struck this Motion to Dismiss as moot. Dkt. 55. Subsequently, Defendants filed a Motion to Dismiss Claims Against the United States and Memorandum in Support of that motion on October 9, 2020. Dkts. 61 & 62.

**INTRODUCTION**

The outbreak of COVID-19, also known as Coronavirus, wreaked unprecedented havoc on the United States and its economy (the "Pandemic"). Michael R. Sisak et al., *'We Need Help': Economic, health crises grow as cases top 1M*, ASSOCIATED PRESS (April 2, 2020). Leading up to the CARES Act passage, extraordinary numbers of Americans lost their jobs. *Id.* Schools

1

across the country were cancelled. Cory Turner, *Half of U.S. Public School Students are Home for the School Year*, NPR (April 16, 2020). Courts closed entirely for a brief period, initially reopening only for hearings on criminal duty matters. *See* N.D. IL General Order No. 20-0014, March 20, 2020; and Second Amended General Order No. 20-0012, March 30, 2020. The Pandemic inflicted unheard of economic ramifications, and Congress responded in an unprecedented way, enacting the largest economic stimulus package in United States history. Jordan Fabian and Justin Sink, *Trump Signs $2 Trillion Virus Bill, Largest Ever U.S. Stimulus*, BLOOMBERG (March 27, 2020). On March 25 and 26, 2020, Congress passed the CARES Act. CARES Act, Pub. L. No. 116-136, March 27, 2020, 134 Stat 281. The next day, President Donald J. Trump signed the CARES Act into law. *Id*.

Congress provided for immediate distribution of funds to combat multiple issues – not just record unemployment, but also record job elimination. *Id.* The Pandemic caused sharp declines in retail sales and in individuals' abilities to pay housing and food expenses. Heather Long and Renae Merle, *Many Americans' Biggest Worry Right Now is April 1 Rent and Mortgage Payments*, WASHINGTON POST (March 22, 2020). The CARES Act pushed emergency funds into the hands of desperate Americans, so that they could pay necessary living expenses – right away.[1] The record-breaking relief measure helped to prevent unprecedented evictions, foreclosures, health care emergencies, and starvation threatening hundreds of millions of Americans. Long, *supra.* Microsoft co-founder Bill Gates said: "***It is impossible to overstate the pain people are feeling now and will feel for years to come***." Sandi Doughton, *'It is Impossible*

---

[1] According to the Internal Revenue Service, necessary living expenses include food & clothing, housing and utilities, healthcare, and transportation. *Collection Financial Standards*, IRS.GOV (March 30, 2020)  https://www.irs.gov/businesses/small-businesses-self-employed/collection-financial-standards (last visited June 19, 2020).

*to Overstate the Pain': Fight Against Coronavirus Will Define Our Era, Bill Gates Says*, THE
SEATTLE TIMES (April 23, 2020).

The CARES Act sought to ease this pain for individuals and jump-start the economy by
creating a refundable tax credit for any eligible individual who holds a social security number
("SSN") by adding 26 U.S.C. § 6428 to the Internal Revenue Code. S. 3548, 116th Cong. (2020)
("Section 6428"). Section 6248 provides for an Economic Impact Payment to be made in the
form of an Advance Payment to all individuals who are eligible to receive the credit on or before
December 31, 2020 (the "Advance Payment"). Congress mandated the Advance Payments to be
made "as rapidly as possible," and directed the Secretary of the Treasury to conduct a public
awareness campaign regarding "information about availability of the credit and rebate." CARES
Act, § 2201(e). While Section 6428(e) requires a "truing up" of the Advance Payment with an
individual's income tax return based on the actual amount of the 2020 credit permitted
(computed based on 2020 filing status and liability), if an eligible individual receives an
overpayment *it is not required to be repaid*. I.R.C. § 6428(e). In other words, the Advance
Payment is a benefit conferred to United States citizens who meet certain income eligibility
requirements, and they may retain it even if it later turns out they were not eligible. *Id.*

Recognizing the dire circumstances faced by many families and the threat to our national
economy, Congress directed that any Advance Payment **must be paid** *before* December 31,
2020, or not at all, because Congress expressly forbid the Commissioner of Internal Revenue
from issuing any Advance Payment later: "[n]o refund or credit shall be made or allowed under
this subsection after December 31, 2020." I.R.C. § 6428(f)(3)(A).

However, under the exclusion provision found in § 6428(g)(1)(B) (the "Exclusion
Provision"), Plaintiffs and the Putative Class are not eligible for Advance Payments under the

Act because they filed taxes jointly with their spouses, who do not hold SSNs. I.R.C. § 6428(g). American citizens who are married to other American citizens and met the income eligibility requirements in 2019 will receive the Advance Payment even if it turns out that their income in 2020 exceeds the statutory income ceilings. The same is true of unmarried American citizens, as well as American citizens married to non-citizens who have a social security number. Only Plaintiffs and the Putative Class – American citizens married to individuals who do not have an SSN who file joint income tax returns but otherwise meet all eligibility requirements – are excluded from receiving the Advance Payment based solely on whom they married.

Depriving U.S. citizens of an emergency benefit that has been distributed to over one hundred million Americans (and counting), does not need to be repaid by other Americans who are later determined to be ineligible to receive it, and – by its own terms – must be issued on or before December 31, 2020, or not at all, based purely on whom those chose to marry violates the United States Constitution. *See* Dkt. 25 at 16-17. Plaintiffs could request the credit (thereby risking potential criminal liability), file an administrative claim for refund, and litigate the propriety of the Exclusion Provision in the years to come. But doing so would not and could not afford them equal treatment under the law as compared to their fellow American citizens: eligibility to receive an Advance Payment, before December 31 of this year, that does not require repayment regardless of later eligibility determinations.

Defendants mistakenly argue that this court lacks subject matter jurisdiction over Plaintiffs' claim due to sovereign immunity. Dkt. 62 at 6. Because sovereign immunity is waived under the APA, jurisdiction is unequivocally established here. Defendants wrongly assert that Plaintiffs injury is speculative and thus Plaintiffs lack standing to bring this claim. Dkt. 62 at 14. However, the discriminatory denial of the Advance Payment is a present and cognizable injury;

4

Plaintiffs' claim is ripe, and Plaintiffs have standing to bring this claim. Lastly, Defendants wrongly claim that Plaintiffs failed to plead a valid constitutional claim. Dkt. 62 at 18. On the contrary, the Exclusion Provision violates Plaintiffs' First Amendment rights of Freedom of Association and Expression, as well as Plaintiffs' Fifth Amendment rights of Due Process and Equal Protection.

**ARGUMENT**

## I.  Sovereign Immunity is Waived by the APA Regardless of Whether a Claim "Arises Under" the APA

Plaintiffs' claims arise under the Constitution of the United States, and accordingly 28 U.S.C. § 1331 ("Section 1331") confers jurisdiction to this Court. Section 1331 provides "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws […] of the United States." 28 U.S.C. § 1331. Section 1367 similarly allows jurisdiction over any supplemental claims "that are so related to claims in the action within [the court's] original jurisdiction that they form a part of the same case or controversy." 28 U.S.C. § 1367(a).

The Supreme Court's decision in *Department of Homeland Security et al. v. Regents of the University of California Wolf v. Vidal*, No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020) ("*Regents*") eliminates any doubt that this Court has jurisdiction over Plaintiffs' claims. In *Regents*, an immigration relief program known as Deferred Action for Childhood Arrivals ("DACA") provided a means for certain individuals who are not citizens or legal permanent residents to remain in the United States. *Id.* at *3. The Department of Homeland Security ("DHS") rescinded the program, and the Department's Acting Secretary issued a memorandum terminating the program. *Id.* Affected individuals and third parties challenged the rescission, arguing, *inter alia,* that the termination violated the Administrative Procedure Act ("APA"). *Regents*, 2020 WL 3271746, at *3.

Like here, in *Regents,* the government argued that the agency action at issue fell "outside this Court's jurisdiction." *Id.* at 7. The Supreme Court rejected that contention because § 702 of the APA's "basic presumption of judicial review for one suffering legal wrongs because of agency action" applied, and that the Court had jurisdiction. *Id.* (internal citations and quotations omitted). The government has not argued here, as it did in *Regents*, that the Treasury or IRS's actions are "committed to agency discretion by law," thus falling under the rare exception to the broad grant of judicial review over agency action. *Id.* Indeed, such an argument would fail here, because the Exclusion Provision does not provide for agency discretion.

Where, as here, Plaintiffs raise a valid claim that arises under federal law, the federal government is the defendant, and the suit does not seek money damages, "jurisdiction is secure." *Blagojevich v. Gates*, 519 F.3d 370, 371 (7th Cir. 2008). The APA waives sovereign immunity for the kind of relief Plaintiffs seek, so long as the federal statute at issue authorizes review of agency action. *Id*. at 372. The APA provides an express waiver of sovereign immunity where, as here, the plaintiffs seek equitable relief. 5 U.S.C. § 702. Section 702 provides in relevant part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency [. . .] acted or failed to act [. . .] shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

In *Blagojevich v. Gates*, the then-governor of Illinois sued the Secretary of Defense under 28 U.S.C. §§ 1331 and 1346(a)(2). The District Court for the Central District of Illinois dismissed the suit *sua sponte* because the government had not waived sovereign immunity and thus, the court lacked jurisdiction. *Blagojevich*, 519 F.3d at 370. The Seventh Circuit Court of Appeals reversed and remanded the case, holding § 702 of the APA is generally applicable, regardless of whether a claim is "under the APA;" and § 702 governs when "*any* federal statute authorizes review of agency action." *Id.* at 372 (*citing Bowen v. Massachusetts*, 487 U.S. 879

(1988)) (emphasis in original). The Court of Appeals for the Ninth Circuit reached a similar conclusion when, in *The Presbyterian Church (U.S.A.) v. United States*, the court reversed and remanded a case to the District Court of Arizona. 870 F.2d 518 (9th Cir. 1989). The Ninth Circuit rejected an attempt by INS to limit § 702 to agency action, holding, "nothing in the language of the [1976] amendment to [§ 702] suggest that the waiver of sovereign immunity is limited to claim challenging conduct falling within the narrow definition of 'agency action.'" *Id.* at 525.

In an almost identical action, the court in *Amador v. Mnuchin* held that sovereign immunity was waived under § 702, and thus, the court had subject matter jurisdiction to hear similar claims concerning the CARES Act. 2020 WL 4547950, at *10 (D. Md. Aug. 5, 2020). Defendants argue *Amador* was wrongly decided and that § 702 does not apply because a waiver under the APA only applies when "there is no alternative remedy specified by statute." Dkt. 62 at 10 fn. 5, (*citing Blagojevich*, 519 F.3d at 372). However, the court in *Amador* held that sovereign immunity was waived under § 702 because the court was doubtful that § 7422 can serve as a statutory basis for Plaintiffs to challenge the Exclusion Provision. 2020 WL 4547950, at *9. As more fully explained in Section III. B., § 7422 is **not** the exclusive remedy for Plaintiffs' exclusion from the CARES Act Credit. And for the reasons stated throughout this brief, *Amador* was correctly decided.

Provisions such as "5 U.S.C. § 701(a), and § 706(2)(A) allow[] a court to set aside agency action that is 'not in accordance with law,'" and that law is not limited to "another portion of the APA." *Id.* The Court of Appeals for the District of Columbia has reached the same conclusion. In *Trudeau v. Federal Trade Commission*, the Federal Trade Commission ("FTC") sought to dismiss a lawsuit for lack of jurisdiction, arguing that the court had no jurisdiction over

the infomercial producer plaintiff's First Amendment claims against it. *Trudeau v. Federal Trade Com'n*, 456 F.3d 178, 184-185 (D.C. Cir. 2006). The Court of Appeals held that Section 1331 provided jurisdiction. *Id.* at 185. The APA's "waiver of sovereign immunity applies to any suit whether under the APA or not." *Id.* at 186. *See also Delano Farms Co. v. California Table Grape Com'n*, 655 F.3d 1337, 1334 (Fed. Cir. 2011) ("We hold that section 702 of the APA waives sovereign immunity for non-monetary claims against federal agencies, subject to the limitations in subsections (1) and (2). It is not limited to 'agency action' or 'final agency action,' as those terms are defined in the APA."); *Michigan v. United States Army Corps of Engineers*, 667 F.3d 765 (7th Cir. 2011) (sovereign immunity waived when "any federal statute authorizes review of agency action, as well as in cases involving constitutional law.").

Claims challenging Department of Treasury and Internal Revenue Service action – such as distributing billions of dollars of Advance Payments to United States persons but unconstitutionally excluding U.S. persons who are married to individuals who do not have SSNs – have fared the same. For example, in *Freedom from Religion Foundation, Inc. v. Schulman*, the District Court for the Western District of Wisconsin held that the APA waived sovereign immunity when the Plaintiff challenged IRS policy "pursuant to the Fifth Amendment's equal-protection clause and the Establishment Clause." 961 F. Supp.2d 947, 954 (W.D. Wis. 2013). Despite the lack of final agency action or action committed to agency discretion, the court held "the second sentence of § 702 still waives the United States's [*sic*] sovereign immunity […] because that sentence is not limited to claims brought under the APA itself but **is generally applicable to any action for prospective relief, including an action involving a constitutional challenge**." *Id.* (emphasis added). Section 702 applies here because Defendants have issued

Advance Payments to over one hundred million Americans, but Plaintiffs are unconstitutionally ineligible.

## II.    Plaintiffs' Claims are not Barred by the Anti-Injunction Act or the Declaratory Injunction Act

### A.    *Refundable Tax Credits are Not Taxes, and Do Not Implicate the AIA or the DJA.*

Defendants summarily state in a footnote that the Anti-Injunction Act and Declaratory Judgement Act would also bar this suit. Dkt. 62 at 8 fn. 4. Defendants misunderstand the CARES Act credit. The CARES Act creates a "refundable tax credit." *See* Dkt. 62 at 11. Because it created a refundable tax *credit* and not a *tax*, neither the Anti-Injunction Act ("AIA") nor the Declaratory Judgment Act ("DJA") bar this Court's review of the claims. Both the AIA's text and its prior conclusive judicial interpretation make clear that Plaintiffs' claims cannot be construed as an attempt to "restrain[] the assessment and collection of any tax [...]" within the meaning of the statute, thereby removing the essential predicate for applying the AIA.

The AIA does not bar this suit because Plaintiffs and the Putative Class do not seek to restrain assessment or collection of any *tax*. The AIA provides:

> Except as provided [...] no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

I.R.C. § 7421(a). The CARES Act creates a refundable tax credit to be distributed as an Advance Payment. Providing equal access to the Advance Payment to Plaintiffs will not restrain assessment or collection of tax. I.R.C. § 6428(f)(3)(A). The DJA, 28 U.S.C. § 2201(a), which generally bars federal courts from granting declaratory judgments "with respect to Federal taxes," has been deemed to be "coterminous" with the AIA. *Fla. Bankers Ass'n v. U.S. Dep't of the Treasury*, 799 F.3d 1065, 1067 (D.C. Cir. 2015) (*citing Cohen v. United States*, 650 F.3d 717, 730-31 (D.C. Cir. 2011) (*en banc*)); *see also Bob Jones Univ. v. Simon*, 416 U.S. 725, 733

n.7 (1974). Accordingly, neither the AIA nor the DJA inhibit this Court's jurisdiction or the APA's waiver of sovereign immunity.

While the AIA denies a court's jurisdiction from maintaining a "suit for the purpose of restraining the assessment or collection of any *tax*," I.R.C. § 7421 (emphasis added), Defendants concede that the Advance Payment is not a tax. The Supreme Court emphasized the importance of the term "tax" in AIA's text in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 543-46 (2012) ("*NFIB*"), when it considered whether the AIA precluded the Court from reaching the merits of a constitutional challenge to the Affordable Care Act before payment of the shared responsibility payment. The Court noted the "decision to label this exaction a 'penalty' rather than a 'tax' is significant." *NFIB*, 567 U.S. at 544.

The AIA applies only when the item at issue is an "exaction," i.e., an amount due the Government, when Congress chooses to call that exaction a "tax." The D.C. Circuit took that rationale to its logical conclusion in *Florida Bankers Association v. U.S. Department of the Treasury*, 799 F.3d 1065, 1067 (D.C. Cir. 2015), declining to reach the merits of a challenge to a regulation imposing reporting requirements on banks, a "penalty" codified at 26 U.S.C. § 6721(a). Then-Judge Kavanaugh explained, "any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter." *Id.* at 1068. He went on, "[i]f the penalty here were not itself a tax, the Anti-Injunction Act would not bar this suit." *Id.* at 1069.

Defendants compare the Earned Income Tax Credit ("EITC") to the CARES Act Advance Payment. *See* Dkt. 62 at 35. The EITC is a refundable tax credit intended "to negate the disincentive to work caused by Social Security taxes." *Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851, 858 (1986). It is precisely for that reason – that the EITC is a refundable tax credit *and*

*not a tax* – that courts have unequivocally held that the AIA and the DJA do not apply to bar class action lawsuits based upon refundable tax credits. For example, in *Nelson v. Regan*, 731 F.2d 105 (2d Cir. 1984), a certified class sought declaratory and injunctive relief where refundable portions of the EITC were being intercepted pursuant to § 6402(c) of the I.R.C. to satisfy past due child support obligations. On appeal, the Second Circuit held that neither the AIA nor the DJA prevented a hearing on the merits, because "the tax intercept program [seizing past due child support] does not apply to refunds or payments of earned income credits." *Id.* at 110-12.

A circuit split developed on the issue when the Ninth Circuit came out the other way in *Sorenson v. Sec'y of Treasury of U.S.*, 752 F.2d 1433 (9th Cir. 1985), holding that EITCs *were* subject to being intercepted under § 6402(c). The Ninth's Circuit's holding was premised on the conclusion that the EITC was "***undisputedly owed to petitioner*** and undisputedly not owed to the United States **as taxes**." *Sorenson*, 752 F.2d at 1437 (emphasis added). Eventually, the Supreme Court resolved that split by siding with the Ninth Circuit in *Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851 (1986), holding that the EITC was subject to the past due child support intercept program. Tellingly, the Government abandoned their jurisdictional challenges under the AIA and the DJA before the Supreme Court.[2] Thus, every court to hear a challenge to the propriety of including refundable EITCs in tax refunds intercepted and directed toward back child-support obligations proceeded to the merits thereof, notwithstanding the AIA or DJA.

_____

[2] In its brief to the Supreme Court, the government acknowledged that jurisdictional contentions to district courts were "based chiefly on the Anti-Injunction Act, the tax exception to the Declaratory Judgment Act, procedural limitations on refund suits, and sovereign immunity …. To the extent the government renewed these arguments on appeal, the Ninth Circuit likewise rejected them …, and we have not sought review of those questions here." Brief for the Respondents, p. 4, fn. 1 (internal citations omitted).

Similarly, in *Church of Scientology of Celebrity Ctr., Los Angeles v. Egger*, the District Court for the District of Columbia denied the Commissioner's Motion to Dismiss for lack of jurisdiction on a claim that the IRS consider and rule promptly on applications for ministers to receive certain tax-exempt status. 539 F. Supp. 491, 494 (D.D.C. 1982). The court denied the IRS's motion on the relevant count, because neither the AIA nor the DJA bar actions "**where the litigation did not threaten to deny anticipated tax revenue to the Government**." *Id.* (internal citations and quotations omitted, emphasis added). The Government anticipates no tax revenue here. The AIA and DJA simply do not apply.[3]

    B.    *CARES Act Amendments to the Internal Revenue Code Expressly Providing that the CARES Act Payments are Subject to Deficiency Procedures Remove Any Doubt that the Credit is Not a Tax.*

Finally, Congress made additional amendments to the Internal Revenue Code when establishing the Advance Payment that eliminate any possible argument that the CARES Act Advance Payment is a tax that implicates the AIA or the DJA. Subtitle F of the Internal Revenue Code provides for procedure and administration thereof. Within Subtitle F, Chapter 63 provides for the Secretary's assessment authority (§ 6201 *et seq.*) and deficiency procedures (§ 6211 *et seq.*). In general, when a taxpayer disagrees about the amount of tax or additions to tax that are due, the IRS will determine a deficiency and issue a Notice of Deficiency, affording the taxpayer a right to contest the IRS's determination in United States Tax Court ("Tax Court"), a pre-payment forum. I.R.C. §§ 6211, 6212. Or, if the IRS has determined that certain "assessable penalties" apply, the IRS may assess the penalties and the taxpayer must pay the disputed

---

[3] On May 4, 2020, the Supreme Court granted certiorari to *CIC Services, LLC v. Internal Revenue Service*, Docket No. 19-930 (Sup. Ct. 2020) to resolve an apparent Circuit Split between the Sixth, Seventh and Tenth Circuits on the question of whether the Anti-Injunction Act bars challenges to unlawful regulatory mandates issued by administrative agencies when those mandates are not taxes.

amount in full and file a claim for refund with the IRS and then in either District Court or the Court of Federal Claims. I.R.C. §§ 6671, 7422.  If a taxpayer does not file a timely petition in Tax Court after receiving a Notice of Deficiency, paying the disputed tax and filing a claim for refund is often the only means to obtain judicial review. I.R.C. § 7422.

If the CARES Act created a tax, § 7422 would provide the proper avenue for judicial review. However, in addition to creating the credit contained in § 6428, the CARES Act also amended § 6211 of the Internal Revenue Code. The amendment to § 6211 now provides that the CARES Act rebate is subject to deficiency procedures and allows taxpayers to contest adverse determinations regarding CARES Act eligibility in Tax Court. This change to § 6211 creates administrative ease both for the taxpayer and for the Internal Revenue Service. If the CARES Act credit was a tax that triggered the AIA, Congress would not have needed to expressly provide that it is subject to deficiency procedures in § 6211(b)(4)(A), because all *tax* is already subject to deficiency procedures under § 6211(a). Giving meaning to every word in the statutes Congress enacted requires the conclusion that the CARES Act created a tax credit, not a tax, and a suit preventing Defendants from depriving Plaintiffs equal access to that credit would not restrain assessment or collection of any tax. Instead, the Advance Payment under § 6428 is a refundable credit—the inverse of an exaction or a tax.

III.    *In the Alternative*, Plaintiffs' Case Does "Arise Under" the APA

Agency action reviewable under § 704 of the APA, unlike § 702 of the APA, must be "final" and there must be no other adequate remedy for judicial review. *U.S. Army Corps of Engineers v. Hawkes Co.*, *Inc.*, 136 S. Ct. 1807 (2016) ("*U.S. Army Corps*"). Section 702 of the APA creates a general waiver of the government's sovereign immunity, regardless of the cause of action. *See* Section I, *supra*. However, even if that were not the case, despite what Defendants

argue, Plaintiffs have stated a claim pursuant to the APA under § 704 as well as under § 702. Dkt. 62 at 8-11. *U.S. Army Corps*, cited in Defendants' Memorandum in Support of Motion to Dismiss, illustrates exactly why Plaintiffs will prevail, even if they were required to establish that agency action is final and that no other adequate review of agency action exists (which, as explained above, they are not required to do). Dkt. 62 at 8.

      A.      *The Agency Action at Issue is Final.*

Agency action is "final" for purposes of § 704 of the APA if it "mark[s] the consummation of the agency's decision-making process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps*, 136 S.Ct. at 1813. The Treasury Department and IRS's decision-making process here is complete as it relates to Plaintiffs and the Putative Class. Advance Payments have been issued to over one hundred million Americans (*see* Dkt. 25-1) and will not be issued to Plaintiffs based on their having filed taxes jointly with spouses who do not have an SSN. Defendants do not argue otherwise, but instead argue that *Plaintiffs'* circumstances may change. That may be true, but a change in circumstances would not render Plaintiffs eligible for the Advance Payment. The agencies' decision-making process here is in accordance with the statute, which deprives Plaintiffs of equal treatment as compared to their fellow Americans. Secondly, there can be no question that the Treasury Department and IRS's final agency decision, in issuing Advance Payments to other eligible Americans but not Plaintiffs and the Putative Class, is an action that determined rights or obligations. Defendants do not argue otherwise.

In *U.S. Army Corps*, the Supreme Court employed "the 'pragmatic' approach we have long taken to finality." *Id*. at 1814. When agency determination deprives a party of a right or benefit others enjoy, it is final. *Id*. at 1815. Here, Defendants determined that Plaintiffs and the

Putative Class are not eligible to receive Advance Payments, while they have deployed Advanced Payments to other eligible persons. The agency action is final.

B.       *No Adequate Alternatives for Challenging the Agency Action Exist.*

In *U.S. Army Corps.*, (cited in Dkt. 62 at 8), the Supreme Court held that "parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of serious 'civil and criminal penalties.'" 136 S. Ct. at 1815. As Plaintiffs explained in detail in the TRO Reply, such is the case here. Dkt. 25 at 11-18. If Plaintiffs are not provided with the Advance Payment, to claim the credit, Plaintiffs must file a tax return after filing season opens on or about February 1, 2021. Plaintiffs would either need to (A) file a tax return claiming the credit and file a statement explaining they are not entitled to the credit but are claiming it, and contesting the unconstitutional aspects of the law, or (B) file a tax return that does not claim the credit, pay their taxes in full, and months later file an amended return claiming the credit as a claim for refund following the procedures in I.R.C. § 7422. No matter what avenue Plaintiffs choose, they will never receive the emergency Advance Payment, which must be issued by December of 2020, and the earliest potential judicial intervention is years away.

If Plaintiffs select option A, they open themselves up to potential civil and criminal liability, s*ee*, I.R.C. §§ 6662, 7201, and must litigate the right to the credit in United States Tax Court. I.R.C. § 6212. If Plaintiffs select option B, as suggested by Defendants, they must wait until at least November 2021 before they can even file suit. Refund claims the IRS deems false are subject to severe criminal and civil penalties. *See*, *e.g.*, 18 U.S.C. § 287, Internal Revenue Manual 9.1.3.4.7.1 (05-15-2008) (5) ("Application of 18 U.S.C. § 287 is particularly appropriate in instances where a false claim for refund has been filed. ***It is only necessary to prove the***

***defendant filed the claim for refund knowing that he/she was not entitled to receive it***."
(emphasis added)). Moreover, the Supreme Court expressly rejected the notion that long,
arduous, and expensive litigation is an adequate alternative to an injunction prohibiting agency
action. *U.S. Army Corps*, 136 S.Ct. at 1815-1816.

## IV.   Plaintiffs Have Standing and their Claims are Ripe for Judicial Review Now

Plaintiff and the Putative Class have been denied a benefit that has already been provided
to over one hundred million other American citizens. *See* Dkt. 25-1. The only thing
distinguishing Plaintiff and the Putative Class from those eligible to receive the Advance
Payment is whom they married. *See* Dkt. 20 ¶ 28. American citizens who are not married to non-
SSN holders need not wait to file a 2020 tax return in 2021 and file a claim for refund to receive
the Advance Payment—it was automatically issued to them. *See* Dkt. 25-2. And if those
American citizens who are not married to individuals who lack an SSN end up earning too much
money in 2020 to qualify for the credit, it need not be repaid. I.R.C. § 6428(e).

Conversely, U.S. citizens who are married to individuals who do not have an SSN and
file jointly are not eligible to receive the Advance Payment. Absent this Court's intervention,
they will never receive it, because it must be issued by December 31, 2020 or not at all. An
administrative claim for refund followed by expensive refund litigation will thwart
Congressional intent to prevent Plaintiffs' suffering ***right now***, including the risk of
homelessness, starvation for them and their families including young children, inability to seek
medical treatment, and lack of basic necessities such as food, medicine, and clothing. *See* Dkt. 25
at 33. The IRS has issued Advance Payments to 152,167,600 Americans, including almost
750,000 Americans residing outside of the United States, totaling over $257,954,545,196.00. *See*

Dkt. 25-1. A claim for refund will not address Plaintiffs' deprivation of unequal treatment, **right now.**

Defendants rest upon two fatally flawed arguments here, that Plaintiffs have not been denied an Advance Payment and that Plaintiffs may become eligible for the Advance Payment. Dkt. 62 at 16. However, the court in *Amador* rejected these arguments, noting that because the denial of impact payments to plaintiffs is statutorily compelled by § 6428(g)(1)(B) and is an injury presently faced by plaintiffs, the alleged harm does not rest on a "speculative chain of possibilities." *Amador v. Mnuchin*, 2020 WL 4547950, at *12 (D. Md. Aug. 5, 2020). As explained above, no adequate alternative for challenging the Exclusion Provision exists, including § 7422. *Supra* III. B. The Defendants' argument that Plaintiffs' claims are not ripe until the requirements of § 7422 are exhausted is without merit. Dkt. 62 at 18.

Another case that illustrates the absolute futility of Defendants' arguments is *Freedom from Religion Foundation v. Shulman*, 961 F. Supp.2d 947 (W.D. Wis. 2013). In *Freedom from Religion Foundation*, a tax-exempt organization filed a lawsuit seeking declaratory and injunctive relief against the IRS, alleging that the IRS employed disparate treatment when enforcing a policy requiring tax-exempt organizations to refrain from participating in or intervening in political campaigns. 961 F. Supp.2d at 950. The IRS moved to dismiss, contending that the organization lacked standing to sue and that the suit was barred by sovereign immunity. *Id*. The District Court for the Western District of Wisconsin's careful analysis of the standing claim is particularly instructive here.

> To prove that he has standing to seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Freedom from Religion*, 961 F. Supp.2d at 950 (internal citations omitted). The court found that each and every requirement was met. As is particularly relevant here, "[i]f it is true that the IRS has a policy of not enforcing the prohibition on campaigning against religious organizations, then the IRS is conferring a benefit on religious organizations (the ability to participate in political campaigns) that it denies […] to the Foundation." *Id.* at 951. "As a victim of the IRS's alleged discrimination, the Foundation has suffered injury in fact." *Id.* (*citing Heckler v. Matthews*, 465 U.S. 728, 738-40 (1984)). Here, as in *Freedom from Religion*, the IRS confers a benefit in the form of an Advance Payment (that does not have to be repaid even if eligibility is later determined to be lacking) on U.S. Citizens other than Plaintiffs and the Putative Class. Plaintiffs are now the victims of the Defendants' discrimination, and they too have suffered an injury in fact. And, just as in *Freedom from Religion*, "because the […] IRS's policy is ongoing, the injury is more than actual and imminent," and Plaintiffs "are being deprived of equal treatment right now." *Id.* The Treasury Department and the Internal Revenue Service are the agencies responsible for making the Advance Payment to Americans, other than Plaintiff and the Putative Class. So as in *Freedom from Religion*, the injury is fairly traceable to those agencies and Defendants who are responsible for implementing this policy. *Id.* Finally, even Defendants do not argue, nor could they, that an injunction prohibiting the IRS and the Treasury Department from continuing the policy of discriminating against Plaintiff and the Putative Class would not prevent further injury. *Id.* Accordingly, Plaintiffs have standing, and their injuries that are happening *right now* are ripe for adjudication. *Id.* Defendants' misguided citation to *Thunder Basin Coal Company v. Reich*, 510 U.S. 200 (1994) (Dkt. 62 at 16) for the proposition that courts are reluctant to find pre-enforcement challenges ripe has no bearing on the instant facts, where a benefit has been conferred on hundreds of millions of Americans and indisputably will not be

conferred on Plaintiff and the Putative Class. Simply put, ***discrimination itself*** is a cognizable injury. *Id.* at 952.

## V.     The FCA States a Claim for Relief

In a misguided attempt to sway this Court in favor of its position on the merits, Defendants ask this Court to dismiss the SAC because Acts of Congress are presumed to be constitutional (Dkt. 62 at 18); section 6248(g) does not violate due process or equal protection principles (Dkt. 62 at 22-30); section 6248(d) does not make distinctions based on alienage (Dkt. 62 at 30-32); even if it did such distinction would only be subject to rational basis review (Dkt. 62 at 32-37); and Plaintiffs have failed to state a cognizable legal theory (Dkt. 62 at 39-40). Setting aside the deeply troubling inferences to be drawn from the United States government taking a position that allegations of discrimination do not state a claim on which relief can be granted in federal courts (Dkt. 62 at 22-39), none of the arguments raised by Defendants establish a lack of jurisdiction or the failure to state a claim, and they do not warrant dismissal, much less require it.

The SAC alleges, *inter alia*, that Defendants violated Plaintiffs' right of association, right to due process of law, right to equal protection under the law secured by the First, Fifth and Fourteenth Amendments to the United States Constitution, as well as the penumbra of privacy rights secured by the First, Third, Fourth and Fifth Amendments. *See* Dkt. 20 ¶ 54. The SAC also alleges that Plaintiffs are suffering and, absent this Court's immediate issuance of declaratory and injunctive relief, will continue to suffer irreparable harm, including failure to meet basic necessities of life and the "loss of privacy, reputation in the community, and dignity." *See* Dkt. 20 ¶ 73. Defendants' contention that Plaintiffs' allegations of Defendants depriving them of the ability to pay necessary living expenses and loss of privacy, reputation in the community, and

dignity due to deprivation of constitutionally protected rights do not give rise to a cause of action is patently absurd. Indeed, as the court in *Freedom from Religion* pointed out in rejecting the IRS's contention that it would be "inappropriate for a court to issue an injunction that results in judicial supervision of the IRS's enforcement of the tax code," this "argument goes to the merits of the case" and does not impact standing or stating a valid claim on which relief can be granted. 961 F. Supp.2d at 953.

Defendants' arguments and reliance on caselaw demonstrating the ubiquity of discriminatory impacts resulting from a "scheme of taxation" are misplaced, and, indeed, fail to demonstrate any failure on Plaintiffs' part to state a claim for relief. Indeed, Plaintiffs have demonstrated (and Defendants cannot deny) that the Exclusion Provision is discriminatory on its face. While certainly this Court must consider the legislatures' "efforts to tackle problems," Defendants' own authority notes that this exercise is to be conducted "within the limits of rationality." *See* Dkt. 62 at 19-20. (*citing San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 41 (1973)). Even if this Court were to decide that rational basis review applies to the circumstances here, such a determination could not possibly result in a disposition at the pleading stage of the litigation. *See Castro v. Dart*, 2020 WL 5209805, at *6 (N.D. Ill. Sept. 1, 2020).

A.    *Section 6428(g) violates the First Amendment of the U.S. Constitution.*

1.    <u>Freedom of Association</u>

The Exclusion Provision directly violates the First Amendment of the U.S. Constitution. In *Griswold v. Connecticut*, the Court stressed the sanctity of marriage lying within the zone of privacy created by several fundamental constitutional guarantees. *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965). The Exclusion Provision discriminates against Plaintiffs by invading the

fundamental right to the sanctity of marriage and as a result of the disparate treatment, Plaintiffs are denied an Advance Payment.

The fundamental right of marriage evokes the freedoms of association embodied in our First Amendment. U.S. Const. amend. I. *Roberts v. United States Jaycees*, 468 U.S. 609, 619-20 (1984). Moreover, the Supreme Court has further established a statute may be held constitutionally invalid as applied when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of power is beyond question. *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) ("[T]his Court has often held that a valid statute was unconstitutionally applied in particular circumstances because it interfered with an individual's exercise of [First Amendment] Rights"). The court in *Amador* noted that a similar complaint regarding the Exclusion Provision "states a claim for violation of plaintiffs' associational rights." 2020 WL 4547950, at *19. The First Amendment requires the Right of Privacy and the fundamental right to marry to be protected and the Exclusion Provision of the CARES Act violates it by intentionally discriminating against Plaintiffs based on the person with whom they choose to intimately associate.

## 2. Freedom of Expression

In his prolific November 13, 1789, letter to Jean Baptiste Le Roy, Benjamin Franklin observed: "Our new Constitution is now established, and has an appearance that promises permanency; but in this world nothing can be said to be certain, except death and taxes." That statement continues to profoundly resonate today. Few sections of the United States Code intersect with the daily lives of Americans as does Title 26, the Internal Revenue Code. Each year (except this year), on April 15, hundreds of millions of Americans file their federal income

tax returns, completing one of the most maligned, but necessary, duties of United States personhood.

Plaintiffs, like all United States citizens whose income exceeds a certain amount, are obligated to file federal income tax returns on an annual basis. I.R.C. § 6012. Were Plaintiffs to willfully fail to file income tax returns, the government could criminally prosecute the failure. I.R.C. § 7203. Accordingly, Plaintiffs are required to engage in some degree of protected speech by informing the Internal Revenue Service of information including their name, address, social security number, and gross income. Plaintiffs, as married individuals, are entitled to file jointly with their spouses, but also may file separately from their spouses. I.R.C. §§ 1(a); 6012(a)(1)(A)(iv) ("who is entitled to make a joint return"); 6013 ("Joint returns of income tax by husband and wife"); 7703 ("Determination of marital status"). Marital status on a federal income tax return is determined by I.R.C. § 7703. I.R.C. §§ 1 (a)(1), (d). In general, individuals who are married on the last day of the calendar year have two valid filing status options from which to choose: "married filing jointly" or "married filing separately." I.R.C. § 7703.

The First Amendment protects speech on tax forms. Of course, the right to speech on a tax return is not absolute, and the government has a strong, legitimate interest in encouraging lawful, truthful tax returns and may deter false or frivolous tax returns through imposition of stiff civil penalties. *See*, *e.g.*, I.R.C. § 6702. *Khan v. United States*, 753 F.2d 1208 (3d Cir. 1985) and *Franklet v. United States*, 578 F.Supp. 1552 (N.D. Cal. 1984) both acknowledged that tax returns constitute speech that is afforded First Amendment protection. *Kahn*, 753 F.2d at 1217; *Franklet*, 578 F.Supp. at 1556. Those cases also illustrate the unfortunate way the First Amendment has historically been raised in most tax cases: an attempt to defend protestor-type arguments that undermine administration of this country's voluntary, self-reporting tax system. Not surprisingly,

22

both the *Kahn* and *Franklet* courts held that the government's strong, legitimate interest in effective functioning of a massive revenue system outweighed private citizens' right to express protest through filing federal income tax returns. The premise that speech contained on an income tax return is protected by the First Amendment is applicable here, but unlike in *Kahn* and *Franklet*, permitting the speech at issue will not undermine the administration of our revenue laws or system. And more importantly, unlike in *Kahn* and *Franklet*, Plaintiffs only seek to file valid tax returns that accurately report their marital status, which is protected under the First Amendment as speech and association.

By awarding an Advance Payment to United States Citizens who otherwise meet income eligibility requirements and who are married to other United States citizens, or who are unmarried, or who are married to ITIN holders but do not elect to file income tax returns jointly with their spouses, Defendants have impermissibly restricted Plaintiffs' fundamental First Amendment right to engage in free speech. Denying the Advance Payment to Plaintiffs, who file jointly with their spouses, places an unconstitutional condition on their First Amendment protected right to speak freely about their marriages in the form of jointly filed federal income tax returns. So long as Plaintiffs continue to exercise their First Amendment right to express their marriages through jointly filed income tax returns – an "entitlement" afforded by I.R.C. § 6012(a)(1)(A)(iv) – they will never be eligible for the Advance Payment.

Over sixty years ago, the Supreme Court unequivocally rejected as unconstitutional the type of conditions-based denial of benefits the Government tries to defend here in *Speiser v. Randall*, 357 U.S. 513 (1958). In *Speiser*, the State of California conditioned receipt of a tax exemption on signing a declaration stating that the taxpayer did not support overthrowing the government. *Id.* at 516. The Supreme Court emphatically rejected the offending provision of the

23

statute conditioning receipt of a benefit on engaging in speech as violative of the First Amendment. "It cannot be gainsaid that a discriminatory denial of a tax exemption for engaging in speech is a limitation of free speech." *Id.* at 518. This is so because "the denial of a tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech." *Id.* at 519. Allowing such a statute to stand would "allow the government to produce a result which [it] could not command directly." *Id*. at 526.

Congress may not condition denial of the CARES Act benefit on prohibiting Plaintiffs from engaging in speech in the form of filing tax returns as married filing jointly with their ITIN-holder spouses or requiring Plaintiffs to engage in speech in the form of filing tax returns as married filing separately apart from their ITIN-holder spouses any more than the State of California could require World War II veterans to affirm that they did not advocate overthrowing the government by use of force in order to receive a tax exemption. *Id.* The Supreme Court has roundly rejected the exact kind of conditions-based benefits that seek to influence speech at issue here. *See, e.g.*, *Perry v. Sinderman*, 408 U.S. 593; 597 (1972) ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited."); *Wooley v. Maynard*, 430 U.S. 705, 719 (1977) ("where 'the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message.'"); *W. Va. State Bd. Of Educ. v. Barnette*, 319 U.S. 624, 633-34 (1943) ( "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all[.]"). While it is true that a legislative body's decision not to subsidize the exercise of a

fundamental right does not infringe on that right, *withholding* benefits from certain groups while affording those benefits to others who are similarly situated with a "censorious" purpose violates the First Amendment. *Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019). In *Alliance for Open Society International, Inc. v. United States Agency for International Development*, the Court of Appeals for the Second Circuit affirmed a District Court order granting a preliminary injunction enjoining enforcement of a statute requiring specific speech in exchange for funding. 651 F.3d 218 (2d Cir. 2011). Relying heavily on Supreme Court cases *Wooley, Speiser,* and *Barnette*, the Second Circuit noted that in that case, as with Plaintiffs here, silence was not an option. Here, Plaintiffs must file tax returns and select a valid filing status. I.R.C. § 6012. Where, as in *Alliance for Open Society* and in the case at bar, "the government seeks to affirmatively require government-preferred speech, its efforts raise serious First Amendment concerns." 651 F.3d at 234. At bottom, "[c]ompelling speech as a condition of receiving a government benefit cannot be squared with the First Amendment." *Id.*

Requiring Plaintiffs to file tax returns as "married filing separately" to a receive a benefit they would not be entitled to if they file "married filing jointly" as they are entitled to do under I.R.C. § 6012(a)(1)(A)(iv) cannot be interpreted as anything but an impermissible condition on receiving a government benefit. The Exclusion Provision seeks to compel speech that Congress could never directly compel – requiring United States citizens who are married to ITIN holders to file their income tax returns as "married filing separately" by depriving them of a benefit absent conforming their speech to the desired government outcome. In doing so, the government forces an SSN holder married to an ITIN holder to make a *Sophie's Choice*: allow their speech to be regulated by the government and file separately in an attempt to gain the Advance Payment during this unprecedented time of need, thereby jeopardizing the ITIN holder's application for

legal immigrant status, or file jointly and forgo the Advance Payment. *See* Dkts. 13 at 26-27, 13-1, and 13-2. The government is prohibited from conditioning Plaintiffs' right to receive the benefit in the form of Advance Payment on their agreement to alter their speech to conform to the government's preferred speech.

The Exclusion Provision restricts speech that Plaintiffs have a right to engage in. The burden is therefore on the Government on the ultimate question of constitutionality, as well as to demonstrate that curtailing Plaintiffs' speech is the least restrictive means available to accomplish a legitimate legislative goal. *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666 (2004). The Government has not and cannot meet this burden, and the injunction in favor of Plaintiffs should be granted.

Defendants' assertion that the First Amendment does not extend to this expressive conduct is misplaced. Defendants, as well as the Central District of California to which they cite, rely upon decisions in which courts ruled that dishonest expressions on a tax filing was not protected by the First Amendment to argue that *any* expression on a tax filing is beyond the scope of the First Amendment. *See Patterson v. Commissioner*, No. 8798-86, 1989 Tax Ct. Memo LEXIS 193 (T.C. Apr. 27, 1989) (citing *Braunfield v. Brown*, 366 U.S. 599, 605-07 (1961)); *Jane Doe v. Donald J. Trump*, No. 820CV00858SVWJEM, 2020 WL 5492994, (C.D. Cal. Sept. 2, 2020). In *Patterson*, the court ruled that the First Amendment did not allow a married man to claim he was unmarried on his tax filing. *Id. Patterson* stands for the unsurprising proposition that a married taxpayer may not select an unmarried filing status. Tax Ct. Memo 1989-193. It is axiomatic that First Amendment protections do not extend to untrue statements. They do, however, protect individuals from being coerced into speech that disavows their marriage by denial of a government benefit.

26

As Benjamin Franklin presciently articulated over two hundred years ago, our Constitution, though seemingly permanent, was not as certain as death and taxes. This Court must now elect its course: to either uphold, or curtail, the fundamental protections of the First Amendment to the United States Constitution.

B.  *Section 6428(g) violates the Fifth Amendment of the U.S. Constitution.*

1.  Marriage

The Fifth Amendment provides that no person shall be "deprived of life, liberty or property without due process of law." U.S. Const. amend. V. The Supreme Court has reiterated in numerous contexts that the right to marry is a fundamental right under the Due Process Clause. *See*, e.g., *M. L. B. v. S. L. J.*, 519 U.S. 102, 116, 117 (1996); *Cleveland Bd. of Ed. v. LaFleur*, 414 U.S. 632, 639-640 (1974); *Griswold,* 381 U.S. at 486; *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Discrimination based on the right to marry is presumptively unconstitutional and subject to strict scrutiny. *Baskin v. Bogan*, 12 F. Supp. 3d 1144, 1158 (S.D. Ind.), *aff'd*, 766 F.3d 648 (7th Cir. 2014) or *see*, e.g., *Sugarman v. Dougall*, 413 U.S. 634, 642 (1973). The Fifth Amendment protects freedom of personal choice in matters of marriage and family.

The Exclusion Provision denies Plaintiffs a right afforded to all other United States citizens who are *not* married to a spouse who lacks an SSN. It both impinges on the fundamental right to marry in defining their families through personal choice and is based upon an inherently invidious classification, subject to strict scrutiny. *See*, e.g., *Sugarman*, 413 U.S. at 642.

The Exclusion Provision deprives Plaintiffs of the right to equal protection and due process, which are "absolute" rights "in the sense that they do not depend upon the merits of Plaintiff's substantive assertions." *Carey v. Piphus*, 435 U.S. 247, 266 (1978), (*citing Boddie v.*

*Connecticut*, 401 U.S. 371, 375 (1971)); *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171-172 (1951) (Frankfurter, J., concurring)). The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. *See also Boddie v. Connecticut*, 401 U.S. 371, 375 (1971). Although the Fifth Amendment contains no Equal Protection Clause as does the Fourteenth Amendment, the Fifth Amendment's Due Process Clause prohibits the Federal Government from engaging in discrimination that is "so unjustifiable as to be violative of due process." *Schlesinger v. Ballard*, 419 U.S. 498, 500 n.3 (1975), *quoting Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). *See also, Schneider v. Rusk*, 377 U.S. 163, 168 (1964).

Arguing that § 6428(g)(1) is a classification on the basis of marital status and thus does not impact the fundamental right to marriage does not make it so. *See* Dkt. 62 at 25. The Exclusion Provision *does* disproportionately and negatively impact a taxpayer who chooses to marry someone who does not have an SSN. In contrast to the 'marital penalty' cases relied upon by Defendants, the Exclusion Provision discriminates not on the basis of marital status, but on the basis of his chosen marital partner. *See Druker v. Comm'r*, 697 F.2d 46, 49 (2d Cir. 1982). In *United States v. Windsor*, the Supreme Court held that the Defense of Marriage Act ("DOMA"), which denied same sex couples the right to marry, "violated the basic due process and equal protection principles applicable to the Federal Government" under the Fifth Amendment. 570 U.S. 744, 769-70 (2013). In that case, as here, the plaintiff was already married to his chosen partner and was denied a tax benefit because he was in a marriage that was valid under state law, but the federal government discriminated against. The Supreme Court found standing and jurisdiction. *Id.* The right to marry confers "a dignity and status of immense import." *Id.* at 768. Marriage is "more than a routine classification for purposes of certain statutory benefits [and is]

subject to constitutional guarantees." *Id*. The Court held that DOMA's "principle effect is to identify a subset of state-sanctioned marriages and make them unequal. The principal purpose is not to impose inequality[.]" *Id*. at 772. Similarly, the Exclusion Provision makes a subset of state-sanctioned marriages unequal by – as in *Windsor* – "den[ying] or reduces benefits allowed to families." *Id*. at 773.

Without question, the Defendants have correctly noted that the Exclusion Provision does not deprive Plaintiffs of the right to marry the person of their choice. It does not, unlike the Michigan Marriage Amendment at issue in *Obergefell* or the Defense of Marriage Act at issue in *United States v. Windsor*, 570 U.S. 744 (2013), invalidate or refuse to recognize a marriage as valid. But death by a thousand cuts is nevertheless still death, and a society that allows liberties that should be protected to be chipped away one at a time is destined for despotism. *See, e.g.*, *Den ex dem. Murray v. Hoboken Land & Imp. Co*., 59 U.S. 272, 276 (1855) (the Due Process clause of the Fifth Amendment "is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave congress free to make any process 'due process of law' by its mere will."). For the Exclusion Provision may well be just as pernicious to Plaintiffs' marriages as DOMA was to Edith Windsor and as the Michigan Marriage Amendment was to James Obergefell. By denying Plaintiffs' marriages the *recognition* that Due Process requires, the Exclusion provision deprives the marriage of the *stability* that the CARES Act was designed to provide.

In *Obergefell* and *Windsor*, the Supreme Court was concerned with not only *recognition* of the marriages which those individuals sought to enter, but also with the deprivation of the "constellation of benefits" accompanying marriage. *Obergefell*, 135 S. Ct. at 2601. The Exclusion Provision illustrates just how easily government can denigrate a marriage and deprive

individuals of the "constellation of benefits" that accompany "favored" unions over those that are politically unpopular. Certainly, this Court would not countenance a provision that denied the Advance Payment to United States citizens in same sex marriages, in marriages to individuals from specific countries, or in marriages to individuals of a difference race. Nor should this Court countenance the Exclusion Provision, which deprives Plaintiffs of the recognition and "constellation of benefits" conferred on United States citizens who have chosen to marry someone who has a Social Security Number instead of an ITIN.

The Supreme Court's jurisprudence on the importance and sanctity of the institution of marriage has developed over one hundred years. Since 1888, the Court has recognized that marriage is "the foundation of the family and of society, without which there would be neither civilization nor progress." *Maynard v. Hill*, 125 U.S. 190, 213 (1888). It is with this basic principle in mind that the *Obergefell* Court explained, "just as a couple vows to support each other, so does society pledge to support the couple, offering symbolic recognition and material benefits to protect and nourish the union…" *Obergefell*, 135 S. Ct. at 2601. That pledge falls short here. The purpose and effect of the Exclusion Provision is the same as the purpose and effect of the Defense of Marriage Act and the Michigan Marriage Amendment: "to disparage and to injure" the Plaintiffs. *Windsor*, 570 U.S. at 2696. Accordingly, it violates the Due Process Clause of the Fifth Amendment and must be struck down.

Legislative classifications that burden fundamental rights are subject to strict scrutiny review. Strict scrutiny applies when a legislative classification "impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312(1976). Such classifications are presumed unconstitutional and will survive strict scrutiny only when the government can show the law is

narrowly tailored to a compelling governmental interest. *See Zablocki v. Redhail,* 434 U.S. 374, 388 (1978). Clearly, the Exclusion Provision cannot survive such scrutiny as no reasons put forth by the Defendants demonstrate any compelling government interest, and certainly are not narrowly tailored. Neither administrative ease, nor reconciliation of the payment are compelling government interests and are not narrowly tailored to serve any interests. Accordingly, this court should hold that the Exclusion Provision violates the Fifth Amendment of the United States Constitution.

2. Alienage

Plaintiffs' alienage challenge to the Exclusion Provision, as it relates to Plaintiffs' spouses' immigration status, appears to be a case of the first impression. *See* BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Sta-Rite Indus., Inc. v. Allstate Ins. Co.*, 96 F.3d 281, 285 (7th Cir. 1996) (finding the case to be one of first impression where no Wisconsin court had previously addressed the statute at issue in the given context).

Though the Fourteenth Amendment applies to the States, it has been construed to apply to the Federal Government through the Reverse Incorporation Doctrine via *Bolling v. Sharpe*, 347 U.S. 497 (1954) and its progeny. *See Amador v. Mnuchin*, 2020 WL 4547950, at *1 (D. Md. Aug. 5, 2020); *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995) (applying strict scrutiny to federal government on equal protection grounds). The Fourteenth Amendment states that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In addition, the Privileges and Immunities Clause of the Fourteenth Amendment states that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." U.S. Const. amend. XIV, § 1, cl. 2.

31

Equal Protection and Due Process are implicated when laws discriminate against people for: whom they marry; alienage; poverty; and class. *Boddie v. Connecticut*, 401 U.S. 371, 385 (1971), *citing Takahashi v. Fish & Game Com.*, 334 U.S. 410 (1948), *Griffin v. Illinois*, 351 U.S. 12 (1956), *Skinner v. Oklahoma*, 316 U.S. 535 (1942). Indeed, the right to equal treatment guaranteed by the Constitution is paramount. "[Classifications] based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority [. . .] for whom such heightened judicial solicitude is appropriate." *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (footnotes and citations omitted).

There is abundant jurisprudence invalidating statutes which sought to deny aliens equal protection under the law. *See, e.g., Bernal v. Fainter*, 467 U.S. 216 (1984) (invalidating statute requiring that a notary public be a United States citizen on equal protection grounds and applying strict scrutiny); *Sugarman v. Dougall*, 413 U.S. 634 (1973) (invalidating statute barring aliens from certain civil service positions); *Nyquist v. Mauclet*, 432 U.S. 1 (1977) (holding exclusion of aliens from loan program violated equal protection and applying strict scrutiny). Defendants argue that, as a classification based on alienage, this Court should apply rational basis review to the Exclusion Provision. *See* Dkt. 62 at 33. However, there is ample precedent for applying strict scrutiny to the Exclusion Provision based on alienage. In *Nyquist v. Mauclet*, the Supreme Court encountered a similar argument in that the statute at issue "was not an absolute bar" to the right at issue, but the statute was *directed* at aliens and aliens were harmed by it. 432 U.S. at 9. Simply because the Government is harming both aliens and their families (including United States citizens) through the Exclusion Provision does not mean it can escape strict scrutiny. Similarly, in *Graham v. Richardson*, the Supreme Court invalidated a state statute that denied benefits to a

32

certain class of aliens. 403 U.S. 365 (1971). The Court held, "justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens." In this case, the discriminated class consists of alien spouses, or another words U.S. Citizens. Congress cannot cure the invidious exclusion of aliens by broadening it to include their families in an effort to escape strict scrutiny judicial review, and this Court should reject the attempt to do so. *Mathews v. Diaz*, 426 U.S. 67 (1976), which distinguished *Graham*, is inapposite. In that case, the Supreme Court expressly held there was "no impairment of the freedom of association of either citizens or aliens." *Id.* at 87. Here, the Exclusion Provision directly impairs the freedom of citizens to associate with aliens by withholding a benefit from citizens if they choose to associate with aliens by marrying them and expressing that association through joint tax returns. The Exclusion Provision cannot stand.

**VI.    Even if the CARES Act's Infringement on Plaintiffs' Rights under the Fifth Amendment Warranted Rational Basis Review, there is no Rational Basis for the Exclusion Provision.**

A.     *Administrative Concerns Do Not Constitute a Valid Rational Basis for Excluding Plaintiffs from Receipt of the Advance Payment or the CARES Act Credit.*

First, Defendants contend that Congress may have excluded United States citizens who file jointly with their ITIN-holder spouses for efficiency in delivering checks while denying checks to non-resident aliens. *See* Dkt. 62 at 29-30 (citing *Doe*, 2020 WL 5492994, at *4-*6). Given the record-breaking scope and magnitude of the CARES Act, which implemented never-before seen government aid programs at record speed, efficient implementation seems to have been the last consideration Congress had. The argument that efficient distribution is advanced through the Exclusion Provision displays a fundamental lack of understanding of the innerworkings of the Internal Revenue Service, inappropriately seeks to downplay the difference between treatment of Plaintiffs and all other citizens, including the military, and ignores what the

33

IRS is actually doing, which is to deprive even citizens who have filed separately from ITIN-holder spouses of their Advance Payment.

The IRS has access to most taxpayers' gross income through vast information return reporting, such as IRS Form W-2, Wage and Tax Statement, IRS Form 1099-Misc, Miscellaneous Income, etc. Employers face significant penalties for the failure to gather and report information regarding wages paid to employees to the Internal Revenue Service. I.R.C. §§ 6751, 6752. Plaintiffs do not dispute that Congress has the authority to determine how best to implement revenue laws, but instead contend that the IRS has the means and the information to easily determine which taxpayer earned income and generated deductions. The IRS routinely audits complex partnerships and corporations. Surely the IRS is up to the job of calculating whether an individual is eligible for the Advance Payment; administrative efficiency cannot rationally justify this discriminatory measure.

The disparate treatment Plaintiffs receive as compared with all other United States citizens and with United States Citizens who are married to ITIN holders but are in the military belies the notion that administrative efficiency serves as a rational basis for the Exclusion Provision. *See* Dkt. 62 at 36. Plaintiffs do not dispute that those who sacrifice for our country should be afforded special treatment, but instead contend that this is one more example in which Plaintiffs are treated as an "other."

Plaintiffs are aware of instances in which United States Citizens who are married to ITIN holders and did file tax returns as "married filing separately," but nonetheless have been denied an Advance Payment and told either directly or through an authorized representative that the IRS is unable to issue Advance Payments. *See* Affidavit of Guinevere M. Moore, herein attached as

Exhibit A[4]. On information and belief, these individuals are being told by IRS employees that they must wait to file their 2020 income tax return and claim the Advance Payment at that time. *Id.* If administrative ease were truly behind the Exclusion Provision, then the IRS would be issuing Advance Payments to those taxpayers who filed separately from their ITIN-holder spouses.

Perhaps the most troubling part of the Exclusion Provision is the effect on the lawful immigration process. Specifically, the requirement for a couple to provide bona fide proofs of the marriage. This is evidenced by the Department of Homeland's Security's requirement that the couple demonstrate that the marriage is bona fide by, including but not limited to, "Documentation showing that you and your spouse have combined your financial resources…You must submit clear and convincing evidence that you and your spouse entered into the marriage in good faith and not for immigration purposes if you married your spouse while your spouse was the subject of an exclusion, deportation, removal, or rescission proceeding (including during the judicial review of any one of these proceedings)." *See* Dkt. 13-4. *In Matter of Laureano*, a Board of Immigration Appeals precedent case states in pertinent part: (2) In determining whether a marriage is fraudulent for immigration purposes, the conduct of the parties after the marriage is relevant as to their intent at the time of marriage; evidence to establish intent may take many forms, including, but not limited to, proof that the beneficiary has been listed as the petitioner's spouse on insurance policies, property leases, **income tax forms**, or bank accounts; and testimony or other evidence regarding courtship, wedding ceremony,

---

[4] Plaintiffs include the Affidavit not as proof that the IRS is improperly denying Advanced Payments to Citizens who are married filing separately from their spouses, but as an offer of proof that at a minimum, Plaintiffs are entitled to discovery on how the IRS is implementing the CARES Act.

shared residence and experiences. *See Matter of Laureano*, 19 I. & N. Dec. 1, 1, 1983 BIA LEXIS 18, *1 (B.I.A. December 12, 1983) [emphasis added]. No administrative efficiency is rationally served by this disruption of the sanctity of marriage.

      B.      *The Exclusionary Provision is Merely a Vehicle to Punish an Unpopular Group.*

      The third and final purportedly rational basis Defendants contend may have been behind the Exclusion Provision is a desire to prevent nonresident aliens from receiving the Advance Payment. *See* Dkt. 62 at 32-37. This rationale gets to the heart of what the Exclusion Provision is really about – excluding not only nonresident aliens, but anyone who is associated with them. Congress' desire to deny a benefit to nonresident aliens does not entitle it to deny that benefit to United States citizens who are married to nonresident aliens. The Exclusion Provision seeks to do just that, by forcing married couples to file separately in order to receive the same benefit already distributed to over one hundred million similarly situated citizens.

      In *Department of Agriculture v. Moreno*, the Supreme Court rejected as unconstitutional a similarly hollow "rational basis" for excluding a politically unpopular group from receiving benefits otherwise broadly distributed. 413 U.S. 528 (1973). In *Moreno*, the court considered whether provisions excluding "hippies" from receiving food stamps was unconstitutional. *Id.* The Food Stamp Act was initially enacted without any Exclusion Provision but was amended to define "households" entitled to receive food stamps in a manner that excluded all households that included unrelated individuals. *Id.* at 530, 531. In *Moreno*, as here, scant legislative history provided insight as to the reason for excluding the persons at issue. *Id.* at 534. The government in Moreno attempted to convince the Supreme Court that the law could have had a rational basis, arguing that Congress may have rationally thought that the Exclusion Provision in the Food Stamp Act would reduce fraud. *Id.* at 535. The Supreme Court summarily rejected the post-hoc

36

attempt to rationalize marginalizing a politically unpopular group. "For if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate government interest." *Id.* at 534.

No supposedly rational basis advanced by Defendants outweigh the harm to the Plaintiffs' fundamental rights as articulated in Section I above. There is simply no legitimate government interest that would outweigh Plaintiffs' right to equal treatment under the laws. No matter how popular the desire to harm a politically unpopular group, it does not grant Congress license to exclude from the CARES Act "persons who are so desperately in need of aid." *Moreno*, 413 U.S. at 538.

Without a doubt, equal protection does not prevent the government from treating similar people in different ways. What it does prevent, however, is "the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute." *Eisenstadt v. Baird*, 405 U.S. 438, 447 (1972). The different class in which Defendants have placed Plaintiffs is wholly unrelated to the objective of the CARES Act. In *Eisenstadt v. Baird*, the Supreme Court struck down a contraception law under rational basis review, and patently refused to rely on post-hoc justifications for the statute that the legislature never considered when enacting it. *Id.* at 450-52. Indeed, negotiations on the second round of stimulus checks and the question of whether Plaintiffs will once again be excluded from emergency relief only highlight the political animus that prevented them from receiving the CARES Act Advance Payment. *See*, *e.g.*, Rafael Bernal, *GOP Senators push for stimulus checks to almost 2M excluded Americans*, The Hill (July 25,

2020), https://thehill.com/latino/508984-gop-senators-push-for-stimulus-checks-to-almost-2m-excluded-americans (last visited November 9, 2020).

Former Florida Republican Party chairman, Al Cardenas, put it this way, "For U.S. citizens to once again be treated in a disparate manner in trying times is mean-spirited, and there's no logic to it." *Id.* One of the main arguments for including Plaintiffs is basic fairness as they have SSNs and pay taxes. "They need to redress it, fix it, never repeat it again," Daniel Garza, executive director of The Libre Initiative, told The Hill. "It's a question of flat-out fairness. *See id; see also* Shahar Ziv, *Rubio Renews Stimulus Check Eligibility Push; 1.7 Million U.S. Citizens Currently Excluded*, Forbes (July 26, 2020) https://www.forbes.com/sites/shaharziv/2020/07/26/rubio-renews-second-stimulus-check-eligibility-push-coronavirus-stimulus-package/#7a62be0c3b4b (last visited November 9, 2020).

Defendants claim that a rational basis is established here because Plaintiffs' allegations are "similar to those rejected in *Schinasi*." Dkt. 62 at 34. However, the discriminatory treatment in *Schinasi* was a result of a computational impossibility, rather than the mere intent to discriminate. *Schinasi v. Comm'r*, 53 T.C. 382, 384 (1969). No such impossibility persists regarding the Exclusion Provision, as described above in Subsection A.

The question for this Court to consider under rational basis is whether "there is some ground of difference that rationally explains the different treatment accorded" to persons who are married to ITIN holders and persons who are not. Here, as in *Eisenstadt* and *Moreno*, "no such ground exists." *Eisenstadt*, 405 U.S. at 447. The rationales posited by the government ring hollow and there is no indication whatsoever that they were actually considered by the legislature. Instead, what is evident is a political animus towards Plaintiffs.

Desire to harm a politically unpopular group is never a rational basis for disparate treatment. *Moreno*, 413 U.S. at 534. Desire to undermine a marriage is never a rational basis for disparate treatment.

## CONCLUSION

WHEREFORE, for the reasons stated herein above, Plaintiffs, individually and on behalf of others similarly situated, respectfully request that this Court enter an order denying Defendants' Motion to Dismiss in its entirety.

Dated: November 12, 2020

Respectfully submitted,

JOHN DOE, individually and on behalf of others similarly situated (collectively "Their").

By:    /s/ *Lana B. Nassar*
Lana B. Nassar (IL 6319396)
Blaise & Nitschke, P.C.
123 N. Wacker Drive, Suite 250
Chicago, Illinois 60606
T: (312) 448-6602
F: (312) 803-1940
lnassar@blaisenitschkelaw.com
*One of Their attorneys*

By:    /s/ *Guinevere M. Moore*
Guinevere M. Moore
Moore Tax Law Group LLC
150 N. Wacker Drive, Suite 1250
Chicago, Illinois 60606
T: (312) 549-9992
F: (312) 549-9991
guinevere.moore@mooretaxlawgroup.com
*One of Their attorneys*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 12th day of November, 2020, she caused the foregoing instrument to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois using the CM/ECF system.

/s/ *Lana B. Nassar*
Lana B. Nassar

**Blaise & Nitschke, P.C.**
123 N. Wacker Drive, Suite 250
Chicago, Illinois 60606
T: (312) 448-6602
F: (312) 803-1940
lnassar@blaisenitschkelaw.com
ARDC No. 6319396